**FILED**

JUL 2 2 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
          DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

 JUL ? 2 2003

R.J. REYNOLDS TOBACCO COMPANY;
R.J. REYNOLDS SMOKE SHOP, INC.;
and LORILLARD TOBACCO COMPANY,

           NO. CIV. S-03-659 LKK/GGH

       Plaintiffs,

    v.                    O R D E R

DIANA M. BONTA, Director of the
California Department of Health      **TO BE PUBLISHED**
Services; and DILEEP G. BAL,
Acting Chief of the Tobacco
Control Section of the California
Department of Health Services,

       Defendants.
_____/

    Two tobacco companies bring suit against officials of

California's Department of Health Services.  They challenge the

state's anti-tobacco advertisements, which are funded through a

special surtax on wholesale tobacco sales.  The tobacco

companies claim that the surtax forces them to fund ads with

which they disagree, and that this violates their right to free

speech under the First Amendment.  They also complain that the

1   ads interfere with their right to trial by jury under the

2   Seventh Amendment and unfairly stigmatize them in violation of

3   the Due Process Clause of the Fourteenth Amendment.

4       The tobacco companies have moved for a preliminary

5   injunction and the state has moved to dismiss the complaint.   I

6   decide the matter on the basis of the papers and pleadings filed

7   herein, and after oral argument.[1]

**I.**

**BACKGROUND**[2]

**A.   PROPOSITION 99: THE TOBACCO TAX AND HEALTH PROTECTION ACT**

In 1988, the voters of California approved Proposition 99, a statewide ballot initiative also known as the "Tobacco Tax and Health Protection Act of 1988" ("the Act").[3]   Cal. Rev. & Tax

---

[1]   In addition to unusually extensive and competent briefing by the parties, the court has also had the benefit of briefing by the *amici* American Cancer Society, American Heart Association and American Lung Association.

[2]   Because this case is before the court on defendants' motion to dismiss, the factual summary assumes the truth of all of the allegations set forth in plaintiffs' First Amended Complaint.   I do not here consider the factual showing required for obtaining injunctive relief, since "the irreducible minimum" for such relief is "a fair chance of success on the merits." Benda v. Grand Lodge of Int'l Machinists, 584 F.2d 308, 314 (9th Cir. 1978).   Thus, if the motion to dismiss prevails, the court will have no occasion to consider the plaintiffs' motion.   I have, however, on occasion considered the contents of affidavits filed in support of plaintiffs' motion, where they tender details concerning the facts alleged in the complaint.

[3]   See generally Michael P. Traynor and Stanton A. Glantz, *California's Tobacco Tax Initiative: The Development and Passage of Proposition 99*, 21 J. Health Pol'y & L. 543 (1996); Edith D. Balbach, et al., *The Implementation of California's Tobacco Tax Initiative: The Critical Role of Outsider Strategies in Protecting Proposition 99*, 25 J. Health Pol'y & L. 689 (2000).   The history

1   Code §§ 30121-30130.  The Act imposes a $0.25 per-pack surtax on

2   all wholesale cigarette sales in California known as the

3   Cigarette and Tobacco Products Surtax ("the Surtax").

4       1.   **The Cigarette and Tobacco Products Surtax**

5       The revenue collected by the Surtax is placed in the

6   "Cigarette and Tobacco Products Surtax Fund" and may be

7   appropriated only for the following purposes: (1) tobacco-

8   related school and community health education programs; (2)

9   tobacco-related disease research; (3) medical care for patients

10  who cannot afford to pay and who lack health insurance; and (4)

11  programs for fire prevention and environmental conservation.

12  Id., § 30122(a).  In accordance with these purposes, taxes

13  deposited into the Surtax Fund are allocated, according to

14  specified percentages, among six separate accounts:  Health

15  Education (20%), Hospital Services (35%), Physician Services

16  (10%), Research (5%), Public Resources (5%), and an Unallocated

17  Account (25%), which may be made available for any of the four

18  purposes specified above.  Id., § 30124(b)(1).  The tobacco

19  advertising program at issue in this case is funded through a

20  portion of the Health Education Account, which "shall only be

21  available for the prevention and reduction of tobacco use,

22  primarily among children, through school and community health

23  programs."  Id., § 30122(b)(1).

24  ────────────────────

25  of Proposition 99 has been one of intense legislative and legal
    conflict.  See, e.g., American Lung Ass'n, 51 Cal.App.4th 743 (Cal.
    Ct. App. 1996); Kennedy Wholesale, Inc. v. State Bd. of

26  Equalization, 53 Cal.3d 245 (Cal. 1991).

1          2.   **The Tobacco Control Program**

2          In 1999, the Legislature adopted implementing legislation.

3    Cal. Health & Safety Code §§ 104350-104485.   In conjunction

4    therewith, the Legislature made findings that smoking is

5    detrimental to the health of Californians, that it results in

6    huge costs to the state, and that prevention is the best means

7    of addressing these concerns.[4]  The Legislature also determined

8    that tobacco use prevention and cessation is "the highest

9    priority in disease prevention for the State of California" and

10   made a commitment to "play a leading role in promoting a smoke-

11   free society by the year 2000 . . . ."  Id., § 104350(a)(9),

12   (10).[5]

13   _____

           [4]   The legislature specifically found that:
14
           Smoking is the single most important source of
15         preventable disease and premature death in California.

16         Tobacco-related disease places a tremendous financial
           burden upon persons with the disease, their families,
17         the health care delivery system, and society as a
           whole.   California spends five billion six hundred
18         million dollars ($5,600,000,000) a year in direct and
           indirect costs on smoking-related illnesses.
19
           The elimination of smoking is the number one weapon
20         against four of the five leading causes of death in
           California.
21
     Id. § 104350(a)(1), (7) & (8).
22
           [5]   While California is certainly not "smoke-free," there is
23   substantial evidence, including published medical studies,
     indicating that the Proposition 99 programs, and the media campaign
24   in particular, have been successful in achieving their goals.  See
     C. Fichtenberg and S. Glantz, Association of the California Tobacco
25   Control Program with Declines in Cigarette Consumption and
     Mortality from Heart Disease, New England Journal of Medicine
26   343:24, 1772-1777 (2000); M. Siegel, Mass Media Antismoking

1      The Legislature directed the Department of Health Services

2  to establish "a program on tobacco use and health to reduce

3  tobacco use in California by conducting health education

4  interventions and behavior change programs at the state level,

5  in the community, and other nonschool settings."   Id.,

6  § 104375(a).  Pursuant to this program, known as the Tobacco

7  Control Program, the Department is required, inter alia, to

8  develop a media campaign directed to raising public awareness of

9  the deleterious effects of smoking and to effect a reduction in

10  tobacco use. Id., §§ 104375(b), (c), (e)(1) & (j); 104385(a);

11  104400.

12      Approximately two-thirds of the funds in the Health

13  Education Account are allocated to the Department of Health

14  Services for tobacco control activities.  Plaintiffs allege that

15  the state spends approximately $25 million annually on the

16  challenged advertisements.  Complaint at ¶ 22.

17  **B.    THE CHALLENGED ADVERTISEMENTS**

18      California's anti-tobacco media campaign consists of radio,

19  television, billboard and print advertising.  Complaint at ¶ 14.

20  According to plaintiffs, the ads consistently portray smoking as

21  dangerous and undesirable and the tobacco industry and its

22  executives as deceptive.  Id. at ¶¶ 17, 19.  In several of the

23  television ads, actors playing tobacco executives are shown

24

_Campaigns: A Powerful Tool for Health Promotion_, <u>Annals of Internal</u>

25  <u>Medicine</u>, 129:2, 128-132 (1998); J.P. Pierce, et al, _Has the_

    _California Tobacco Control Program reduced smoking?_, <u>Journal of the</u>

26  <u>American Medical Ass'n</u>, 280:10, 893-899.

1   discussing how to lure more people into smoking or are portrayed
2   as being elusive about smoking's health effects.   See
3   Declaration of Todd Thompson ("Thompson Decl."), Exh. L.   These
4   ads do not contain disclaimers explaining that the people shown
5   are actors rather than actual tobacco company employees.
6   Complaint at ¶ 18.

7        A recent round of television commercials features an actor
8   playing a public relations executive for the fictional cigarette
9   brand "Hampton," detailing for viewers his unseemly methods for
10  getting people to start smoking.   Thompson Decl., Exh. L.   The
11  ads end with the tagline, "Do You Smell Smoke?," id., implicitly
12  referencing both cigarette smoke and a smoke-and-mirrors
13  marketing strategy.   Another ad portrays tobacco executives
14  discussing how to replace a customer base that is dying at the
15  rate of 1,100 users a day.   Id.   Some of the ads end with images
16  of mock warning labels such as: "WARNING: The tobacco industry
17  is not your friend."; or "WARNING: Some people will say anything
18  to sell cigarettes." Id.

19       Several spots suggest that tobacco companies aggressively
20  market to children.   Id.   In one particularly striking
21  television ad entitled "Rain," children in a schoolyard are
22  shown looking up while cigarettes rain down on them from the
23  sky.   Complaint at ¶ 19.   A voice-over states "We have to sell
24  cigarettes to your kids.   We need half a million new smokers a
25  year just to stay in business.   So we advertise near schools, at
26  candy counters.   We lower our prices.   We have to.   It's nothing

6

1  personal.  You understand."  Thompson Decl., Exhibit L.  At the

2  conclusion, the narrator says, "The tobacco industry: how low

3  will they go to make a profit?"  Id.

4     Each of the challenged advertisements is identified as

5  "Sponsored by the California Department of Health Services." Id.

6  **C.   THE PARTIES**

7     Plaintiffs are R.J. Reynolds Tobacco Company, its

8  subsidiary, R.J. Reynolds Smoke Shop, Inc., and Lorillard

9  Tobacco Company.  Both R.J. Reynolds and Lorillard manufacture

10 and sell cigarettes in California.  All three corporations have

11 their principal place of business in North Carolina and are

12 incorporated in Delaware.

13    Lorillard and R.J. Reynolds allege that their business in

14 California requires them to pay the Cigarette and Tobacco

15 Products Surtax; R.J. Reynolds does not pay the Surtax directly

16 but pays it through the Smoke Shop subsidiary.  Because the

17 Surtax is imposed on "distributors" of cigarettes, most Surtax

18 payments are not made by the cigarette manufacturers themselves,

19 but by cigarette wholesalers.  Because plaintiffs also sell or

20 provide small quantities of cigarettes directly to smokers in

21 California, however, they claim that they have and will in the

22 future be required to pay the Surtax.  See Declaration of Steven

23 F. Gentry ("Gentry Decl.") ¶¶ 2, 4.  Plaintiffs state that their

24 combined payments of the Tobacco Products Surtax in 2002 were in

25 excess of $14,000. Gentry Decl. ¶ 4.  Thus, plaintiffs allege

26 that they collectively contributed approximately $2,800 of the

1 | $25 million spent on the challenged ads.

2 | The defendants are Diana M. Bonta, Director of the

3 | California Department of Health Services, and Dileep G. Bal,

4 | Acting Chief of the Tobacco Control Section of DHS.   The

5 | Complaint alleges that "Bonta is the highest-ranking official of

6 | DHS and, accordingly, is ultimately responsible for the

7 | advertising challenged in this action."   Complaint at 2, ¶ 4.

8 | Defendant "Bal is directly responsible for the design, approval

9 | and distribution of the advertising challenged in this action."

10 | Id. at 2, ¶ 5.

11 | **D.   PLAINTIFFS' ALLEGATIONS**

12 | Plaintiffs bring five causes of action.   First, they allege

13 | that the use of the Surtax for funding anti-industry ads

14 | violates the right of free speech secured to them by the First

15 | Amendment.   Second, they allege an identical claim under the

16 | free speech clause of Article I, section 2 of the California

17 | Constitution.   Third, plaintiffs allege that the "anti-industry"

18 | ads stigmatize them, publicly disparage their reputation and

19 | character, and prejudice potential jurors with respect to the

20 | facts that underlie the sort of civil lawsuits that are

21 | frequently brought against them in California.   They allege that

22 | the distribution of the advertisements thus constitutes a denial

23 | of due process, in that the state has publicly stigmatized them

24 | and denied them the right to a fair and impartial jury in

25 | California, in violation of both the Fourteenth and Seventh

26 | Amendments.   Fourth, plaintiffs allege that the distribution of

8

1 the program's anti-industry ads constitutes a denial of their

2 right to a fair and impartial jury under the Seventh Amendment.

3 Fifth, plaintiffs bring a claim for declaratory relief, seeking

4 a judicial declaration that the distribution of the anti-

5 industry ads violates their constitutional rights because it (1)

6 constitutes compelled speech with which they disagree; (2)

7 constitutes disparaging speech which was published without

8 affording them prior notice and hearing; and (3) has the

9 potential to prejudice current and future California jurors with

10 respect to matters at issue in pending litigation.   Plaintiffs

11 also seek an injunction barring defendants from using funds

12 raised by the Surtax to distribute any advertising that

13 "attacks, ridicules, vilifies, or otherwise criticizes or

14 comments negatively upon the conduct or speech of the 'tobacco

15 industry,' or of Plaintiffs."   Complaint at 14 ¶ 1.

16 II.

17 **STANDARDS UNDER FED. R. CIV. P. 12(b)(6)**

18 On a motion to dismiss, the allegations of the complaint

19 must be accepted as true. See Cruz v. Beto, 405 U.S. 319, 322

20 (1972). The court is bound to give the plaintiff the benefit of

21 every reasonable inference to be drawn from the "well-pleaded"

22 allegations of the complaint.  See Retail Clerks Intern. Ass'n,

23 Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n. 6

24 (1963).  Thus, the plaintiff need not necessarily plead a

25 particular fact if that fact is a reasonable inference from

26 facts properly alleged.  See id.; see also Wheeldin v. Wheeler,

1   373 U.S. 647, 648 (1963) (inferring fact from allegations of

2   complaint).

3      In general, the complaint is construed favorably to the

4   pleader. <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). So

5   construed, the court may not dismiss the complaint for failure

6   to state a claim unless it appears beyond doubt that the

7   plaintiff can prove no set of facts in support of the claim

8   which would entitle him or her to relief. <u>See</u> <u>Hishon v. King &</u>

9   <u>Spalding</u>, 467 U.S. 69, 73 (1984) (citing <u>Conley v. Gibson</u>, 355

10   U.S. 41, 45-46 (1957)). In spite of the deference the court is

11   bound to pay to the plaintiff's allegations, however, it is not

12   proper for the court to assume that "the [plaintiff] can prove

13   facts which [he or she] has not alleged, or that the defendants

14   have violated the . . . laws in ways that have not been

15   alleged." <u>Associated General Contractors of California, Inc. v.</u>

16   <u>California State Council of Carpenters</u>, 459 U.S. 519, 526

17   (1983).

18                        **III.**

19                   **STANDING**

20      The defendants' first defense is that the plaintiffs lack

21   standing. As I now explain, plaintiffs' constitutional claims

22   are such that this suit comes close to being "in the class of

23   those cases where standing and the merits are inextricably

24   intertwined." <u>City of Revere v. Massachusetts General Hospital</u>,

25   463 U.S. 239, 243 n.5 (1983).

26   ////

1    "[T]o satisfy Article III's standing requirements, a

2  plaintiff must show (1) it has suffered an 'injury in fact' that

3  is (a) concrete and particularized and (b) actual or imminent,

4  not conjectural or hypothetical; (2) the injury is fairly

5  traceable to the challenged action of the defendant; and (3) it

6  is likely, as opposed to merely speculative, that the injury

7  will be redressed by a favorable decision." Friends of Earth,

8  Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 180-181

9  (2000).  These requirements together constitute the "irreducible

10  constitutional minimum" of standing.  Lujan v. Defenders of

11  Wildlife, 504 U.S. 555, 560, (1992).  The party invoking federal

12  jurisdiction bears the burden of establishing these elements.

13  See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).  "At the

14  pleading stage, general factual allegations of injury resulting

15  from the defendant's conduct may suffice, for on a motion to

16  dismiss we presume that general allegations embrace those

17  specific facts that are necessary to support the claim."  Lujan,

18  504 U.S. at 561 (internal citations and quotation marks

19  omitted).

20  E.    INJURY-IN-FACT

21    Plaintiffs claim they are injured because they are

22  compelled to fund speech with which they disagree and because

23  the airing of the challenged advertisements injures their

24  reputation.  Defendants contend that plaintiffs lack the

25  requisite injury because their stake as taxpayers is too

26  generalized and indirect to confer standing and because the

1 | compelled-speech claim fails as a matter of law.  Defendants
2 | also argue that plaintiffs cannot premise standing on alleged
3 | reputational injury because any such injury is not sufficiently
4 | individualized.

5 | Generally, suits premised solely on state or federal
6 | taxpayer status are not cognizable in the federal courts because
7 | a taxpayer's "interest in the moneys of the Treasury . . . is
8 | shared with millions of others, is comparatively minute and
9 | indeterminable; and the effect upon future taxation, of any
10 | payments out of the funds, so remote, fluctuating and uncertain,
11 | that no basis is afforded for [judicial intervention.]" ASARCO,
12 | Inc. v. Kadish, 490 U.S. 605, 613 (1989) (quoting Frothingham v.
13 | Mellon, 262 U.S. 447, 487 (1923)).  The Supreme Court, however,
14 | has indicated that standing may exist where the "peculiar
15 | relation" of the taxpayer and the taxing entity or program makes
16 | the taxpayer's interest in the application of revenues "direct
17 | and immediate."  Id.

18 | In the matter-at-bar, it appears that plaintiffs have such
19 | a "direct and immediate" interest.  The Surtax in question is
20 | levied only on tobacco wholesalers and manufacturers, for
21 | purposes directly related to their business, so that the
22 | interest at issue is not "shared with millions of others."  Both
23 | the Supreme Court and the Ninth Circuit have indicated that
24 | standing is proper where, as here, a tax is challenged by
25 | members of a small, discrete group on whom the tax is imposed.
26 | See Bacchus Imports v. Dias, 468 U.S. 263, 267 (1984) (liquor

1  wholesalers had standing to challenge constitutionality of
2  liquor excise tax); <u>United States v. Butler</u>, 297 U.S. 1, 61
3  (1963) (farmers had standing to challenge agricultural
4  processing taxes); <u>ACF Indus., Inc. v. California State Bd. of
5  Equalization</u>, 42 F.3d 1286, 1291 (9th Cir. 1994) (holding that
6  where a state "directly assesses [plaintiffs] with the
7  challenged tax . . . the standing issue is not complex.").[6]

8       The plaintiffs, however, are not challenging the tax itself
9  but the government's use of tax dollars.  The question is
10 whether the distinction makes a difference; I conclude that it
11 does not.  Standing in the present context turns on whether the
12 plaintiffs are members of a small, discrete group on whom the
13 tax is imposed and whether the tax is put to uses directly
14 affecting the plaintiffs.  Under this standard, there appears to
15 be no meaningful distinction between attacking the lawfulness of
16 collecting the tax, as contrasted with the lawfulness of the use
17 to which the tax is put.  As I now explain, the issue here is
18 similar to taxpayer standing in another First Amendment context.

19      In Establishment Clause cases, rather than requiring a
20 "direct injury," courts require a plaintiff to demonstrate a
21 logical link between his taxpayer status and the challenged

22

23      [6]  The Tax Injunction Act, 28 U.S.C. § 1343, which creates a
     jurisdictional bar to cases in federal court that seek to enjoin
24   or restrain the collection of taxes under state law, is
     inapplicable here because plaintiffs seek only to enjoin anti-
25   tobacco advertising funded by the tobacco Surtax, not the
     collection of the Surtax itself.  <u>See Hoohuli v. Ariyoshi</u>, 741 F.2d
26   1169, 1177 (9th Cir. 1984).

legislative enactment, and a nexus between his taxpayer status
and the precise nature of the alleged constitutional
infringement.   Flast v. Cohen, 392 U.S. 83, 102-03 (1968); see
also Doe v. Madison Sch. Dist., 177 F.3d 789 (9th Cir. 1999) (to
challenge the constitutionality of a state statute on the basis
of the Establishment Clause, a party must show that "tax
revenues are expended on the disputed practice.").   In Flast,
the decision rested in part on the fact that the Establishment
Clause is a specific limit on the power of Congress to tax and
spend. 392 U.S. at 104.[7]  If plaintiffs' theory on the merits of
their First Amendment claim is correct – i.e. that the Abood
line of compelled expressive association cases may be extended
to cover tax-funded government speech – then it would appear to
follow that the Free Speech Clause would also satisfy Flast,
since in that limited context the Free Speech Clause would also
operate as a limit on the state's power to tax and spend.

Similarly, plaintiff's alleged reputational injuries, on
which their Seventh Amendment and Due Process claims depend, are
not as generalized as defendants contend.   In arguing to the
contrary, defendants rely on Allen v. Wright, 468 U.S. 737
(1984), a case in which the Supreme Court held that the alleged
harm of racial stigmatization was not sufficiently
individualized to confer standing on parents of black children

---

[7]   The Court has never declared that the Establishment Clause
is the only constitutional provision that satisfies the Flast test
for taxpayer standing; it has, however, never found any other
constitutional provision that satisfies the test.

14

attending public schools who challenged IRS policies regarding the tax-exempt status of racially-discriminatory private schools.  The Court explained that "[i]f the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school." Id. at 755-56 (internal citations and quotation marks omitted).  Whatever the strength of Allen's logic,[8] the situation here is entirely different.  The stigma and reputational harm allegedly caused by the challenged advertisements affects only tobacco wholesalers and a handful of large tobacco manufacturers that sell their cigarettes to Californians.  Thus, plaintiffs have sufficiently alleged injury.

**F.   CAUSATION**

In arguing that plaintiffs have failed to demonstrate the requisite causation, defendants again raise arguments that are more properly directed to the merits.  Defendants' causation argument is particularly directed to the merits of plaintiffs' Seventh Amendment claim; they claim that any impact on jury

---

[8]   I note in passing that the observation is less than perfectly persuasive. African-Americans are a distinct group,  and if indeed the government is discriminating against the members of the group in its use of taxes, it is not clear why any member of the group should not have standing.  See generally Gene R. Nichol, Abusing Standing: A Comment on Allen v. Wright, 133 U. Pa. L. Rev. 635, 641-49 (1985).

1  trials caused by the challenged program is entirely speculative.
2  For purposes of the standing inquiry, at least on a motion to
3  dismiss, plaintiffs would appear to have satisfactorily alleged
4  that California's advertising campaign, which has the purpose of
5  changing people's attitudes about tobacco use and maligning the
6  character of the tobacco industry, actually has that effect.
7  These allegations are sufficient to show that the reputational
8  harm alleged flows from the advertisements.

9  **G.   REDRESSABILITY**

10      Finally, defendants argue that plaintiffs' claims, even if
11  sustained, would not be redressable.  As defendants correctly
12  point out, the ordinary remedy in compelled funding for speech
13  cases is a refund of the money used to fund the objected-to
14  speech.  Here, however, plaintiffs do not seek a refund or an
15  order enjoining the state from collecting the Surtax and, in any
16  event, such a remedy would be barred by the Tax Injunction Act,
17  28 U.S.C. § 1343.  The remedy that plaintiffs do seek, however,
18  an injunction prohibiting the defendants from airing the
19  objectionable advertisements, is not barred by statute and has
20  in fact been adopted by at least one court in a compelled speech
21  case.  See Pelts & Skins LLC v. Jenkins, No. 02-384, 2003 WL
22  1984368 (M.D. La. Apr. 24, 2003) (enjoining use of funds in the
23  Louisiana Fur and Alligator Public Education Marketing Fund for
24  the purpose of generic alligator marketing).  Whether or not the
25  relevant law dictates such a remedy is a separate matter.
26  ////

1  Because there appears to be no bar to the remedy plaintiffs
2  seek, they have alleged redressability for purposes of standing.
3      Given all the above, the court concludes that plaintiffs'
4  allegations satisfy Article III's "case or controversy"
5  requirement. I now turn to the merits.

6                              IV.

7                      **THE FIRST AMENDMENT**

8      The tobacco companies argue that California's use of the
9  Proposition 99 Surtax to fund the challenged advertising
10 effectively compels them to fund speech with which they
11 disagree.  They assert that such compulsion violates their
12 rights under the First Amendment.[9]  They do not question the
13 states's right to convey information to its citizens about the
14 health risks of smoking.  Rather, they object to advertising
15 that assails the character, motives and practices of the tobacco
16 industry and seek to enjoin the state from airing ads fitting
17 that description.

18     Defendants and *amici* contend that the advertising is speech
19 by the government on a matter of urgent importance to the public
20 health of its citizens, and as with any other speech by the
21 government, the advertising is necessarily funded by tax
22 revenues.  Under the "government speech" doctrine, they argue,

23 _____

24     [9]   While there is no doubt that corporations enjoy the
protection of the First Amendment, <u>Haque v. CIO</u>, 307 U.S. 496
25 (1939), the Court has not "decid[ed] whether the First Amendment's
protection of corporate speech is coextensive with the protection
26 it affords to individuals." <u>McIntyre v. Ohio Elections Commission</u>,
514 U.S. 334, 353 (1995).

1  taxpayers do not have a right to object to such activity under

2  the First Amendment.  Before turning to the government speech

3  doctrine, I begin by addressing the compelled speech cases on

4  which plaintiffs rely.

5  **A.    WHETHER THE DHS ADVERTISEMENTS ARE IMPERMISSIBLE COMPELLED**

6  **SPEECH**

7      Cases involving "compelled speech" fall into two distinct

8  categories.  The first line of authority, involving situations

9  where the government directly compels citizens to engage in

10 speech activity, is plainly inapplicable here.  The challenged

11 program does not, for instance, require the tobacco companies to

12 repeat an objectionable message out of their own mouths, <u>see</u>

13 <u>West Virginia Bd. of Ed. v. Barnette</u>, 319 U.S. 624, 632 (1943)

14 (government may not compel children, contrary to their

15 conscience, to salute the American flag), or force them to use

16 their own property to convey an antagonistic ideological

17 message, <u>see</u> <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977) (government

18 may not compel motorists, contrary to their conscience, to

19 display license plates bearing the motto "Live Free or Die").[10]

20     Instead, plaintiffs rely on a second line of cases in which

21 the Supreme Court has scrutinized programs that compel people to

22 join and contribute to groups or associations whose speech they

23 ───────────

24     [10]   While the plaintiffs object to the use of "their" tax
   money to fund the advertisements, they do not contend (nor could
25 they, given the undisputed propriety of imposing the tax), that
   funds so raised are not the State's at the time the funds are
26 expended.

1  find objectionable.  See Abood v. Detroit Bd. of Educ., 431 U.S.

2  209 (1977); Keller v. State Bar of California, 496 U.S. 1

3  (1990); Glickman v. Wileman Brothers, 521 U.S. 457 (1997);

4  United States v. United Foods, 533 U.S. 405, 413 (2001) ("[T]he

5  mandated support is contrary to the First Amendment principles

6  set forth in cases involving expression by groups which include

7  persons who object to the speech, but who, nevertheless, must

8  remain members of the group by law or necessity.").[11]

9      As I explain below, plaintiffs' reliance on these cases is

10 unwarranted.  Neither the holdings nor the reasoning in these

11 cases suggest that government's decision to levy a targeted tax

12 used to fund its own speech runs afoul of the First Amendment;

13 moreover, so far as this court can determine, no lower court,

14 state or federal, has found otherwise.  This is not surprising.

15 Cf. National Ass'n for Advancement of Colored People v. Hunt,

16 891 F.2d 1555, 156 (11th Cir. 1990) ("Abood has never been

17 applied to the government, however; if it were, taxation would

18 become impossible.").  Put directly, the courts have

19 consistently drawn a line between the compelled payment of funds

20 to support private expressive association, which may be

21 unconstitutional "compelled speech," and the compelled payment

22 of taxes and other exactions to fund speech by the government

23 _____

24      [11]  I have previously described this line of cases as
    articulating a "doctrine of unwilling allegiance." Prescott v.
    County of El Dorado, 915 F.Supp. 1080, 1085 (E.D. Cal. 1996).

25 I have also noted my sense that this line of cases does not fit
    easily within the conventional pattern of First Amendment issues.

26 Id. at 1085 n. 5.

1    itself.   Questions arising under the latter scenario must be

2    considered under the government speech doctrine.   The Supreme

3    Court cases on which plaintiffs principally rely serve to

4    illustrate this distinction.

5        **1.   *Abood* and *Keller***

6        Chronologically, the first such case is *Abood*.[12]   There,

7    public school teachers in Detroit challenged the "agency shop"

8    provisions of their collective bargaining agreement, which

9    required every teacher represented by the teachers' union,

10   regardless of whether the teacher was a member, to pay a service

11   fee equal to union dues.   431 U.S. at 210.   The Court held that

12   although being required to help finance the union "might well be

13   thought . . . to interfere in some way with an employee's

14   freedom to associate for the advancement of ideas, or to refrain

15   from doing so," any such interference was constitutionally

16   justified by the important contribution of agency shops to the

17   system of labor relations established by Congress.   Id. at 222-

18   232.   When it came to the union's use of service fees for

19   political activities unrelated to collective bargaining,

20   ─────────────────

21       [12]   In their opening brief, plaintiffs propose that "[t]he
     compelled speech doctrine was first applied in International Ass'n
22   of Machinists v. Street, 367 U.S. 740, 768-69 (1961), in which the
     Court held that when employees are required by law to pay dues to
23   a labor union, the union cannot use those dues to support political
     activities the employees oppose."   Pl's MPA in Supp. of Prelim.
24   Inj. at 13.   While this statement of the holding in Street is
     accurate, that holding was dictated by the Court's interpretation
25   of the Railway Labor Act, not by a conclusion that the challenged
     policy violated the First Amendment. 367 U.S. at 768.   In any
26   event, Abood made clear that the First Amendment dictates the same
     result.

1 however, the Court reached a different conclusion; using the
2 fees for such purposes, the Court held, constituted
3 impermissible compelled speech.

4      This holding was dictated by two well-established
5 principles:  first, that "the freedom of an individual to
6 associate for the purposes of advancing beliefs and ideas is
7 protected" by the First . . . Amendment, id. at 233, and second,
8 that "a government may not require an individual to relinquish
9 rights guaranteed to him by the First Amendment as a condition
10 of public employment."  Id. at 234.  It followed, the Court
11 held, that the First Amendment prohibited the union and the
12 school board from requiring any teacher, as a condition of
13 employment, to contribute to the advancement of ideological
14 causes with which the teacher disagreed and which were not
15 "germane" to the union's duties as a collective-bargaining
16 representative.  Id. at 235-35.  The Court carefully limited the
17 prohibition to activity unrelated to the union's core
18 associational purposes, distinguishing between collective
19 bargaining activities, for which otherwise impermissible
20 compelled association was justified, and other purposes, for
21 which no such justification existed.

22      In a concurring opinion, Justice Powell emphasized that the
23 obligation of citizens to contribute taxes to the government,
24 whether or not they agree with how the money is spent, is not an
25 obligation that may be excused by the freedom of speech or
26 association.  In doing so, he highlighted the critical

21

distinction between expressive association and government

speech:

> Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

Id. at 259 n.13 (Powell, J., concurring).

In Keller, the Court expanded on Abood's compelled speech

analysis and, more importantly for our purposes, on the

distinction in Justice Powell's footnote. The Keller Court held

that compelling objecting attorneys to pay dues to the

California State Bar, to the extent that such dues were used to

finance political or ideological activities not germane to the

state bar's function, was invalid. The California Supreme

Court decision under review, relying on the government speech

doctrine, had rejected the attorneys' First Amendment challenge

because it determined that the Bar was a government agency. In

ruling against the Bar, the U.S. Supreme Court did not reject

the state court's rationale. On the contrary, the Court

embraced the distinction between government speech and compelled

speech and merely rejected the premise that the State Bar was

////

////

1  speaking on behalf of the government.[13]   Indeed, the Court

2  quoted the California court's broad articulation of the

3  doctrine, along with Justice Powell's <u>Abood</u> concurrence,

4  apparently with approval:

5        *If the bar is considered a government agency,*
       *then the distinction between revenue derived*
6        *from mandatory dues and revenue from other*
       *sources is immaterial.  A government agency may*
7        *use unrestricted revenue, whether derived from*
       *taxes, dues, fees, tolls, tuition, donation, or*
8        *other sources, for any purposes within its*
       *authority.*

9

10  <u>Keller</u>, 496 U.S. at 10 (quoting <u>Keller v. State Bar</u>, 47 Cal.3d

11  1152, 1167 (1989)) (emphasis added).

12        The High Court, however, concluded that the Bar's primary

13  purpose was the representation of its members, and thus it was

14  functionally equivalent to the union in <u>Abood</u> and "a good deal

15  different from most other entities that would be regarded in

16  common parlance as 'government agencies.'" 496 U.S. at 11.  The

17  Court clearly articulated the difference between the compelled

18  speech at issue there and government speech, holding that "[t]he

19  very specialized characteristics" of the Bar distinguished its

20  role from that of government officials, who "are expected as

21  part of the democratic process to represent and espouse the

22  _____

23        [13]   The Court acknowledged that "the Supreme Court of
   California is the final authority on the 'governmental status' of
   the State Bar of California for purposes of state law" but held

24  that the state court's "determination that the respondent is a
   'government agency' . . . is not binding on us when such a

25  determination is essential to the decision of a federal question."
   496 U.S. at 10.  <u>But see</u> <u>McMillian v. Monroe County, Alabama</u>, 520

26  U.S. 781, 786 (1997).

1 | views of a majority of their constituents." Id.

2 |     As in Abood, the Court found that compelled association

3 | with the Bar was permissible to the extent that it furthered the

4 | Bar's core purposes.  Just as the "agency shop" arrangement was

5 | designed to prevent free-riders (people who benefit from

6 | collective bargaining but don't pay dues), it was appropriate

7 | that "the lawyers who derive benefit" from the Bar's activities,

8 | "should be called upon to pay a fair share of the cost of

9 | professional involvement in this effort." Id. at 11.  Again, as

10 | in Abood, to the extent that the political and ideological

11 | activities funded were not germane to that purpose, compelled

12 | association could not be justified.

13 |     **2.   *Glickman* and *United Foods***

14 |     Plaintiffs place greater emphasis on a pair of more recent

15 | Supreme Court decisions, Glickman and United Foods, both of

16 | which discussed the application of Abood and Keller to programs

17 | that compel agricultural producers to contribute to trade groups

18 | for the purposes of generic industry advertising.  Neither of

19 | these cases, however, upset the Court's distinction between

20 | government speech and impermissible compelled speech.

21 |     In Glickman, the Court rejected a challenge by growers and

22 | processors of California tree fruits, who were required by

23 | marketing orders promulgated by the Secretary of Agriculture

24 | (pursuant to the Agricultural Marketing Agreement Act) to pay

25 | assessments to a Nectarine Administrative Committee and Peach

26 | Commodity Committee.  Those committees, in turn, used the money

1  to pay for generic industry advertising.

2      The Court began its inquiry by stating that "Abood, and the

3  cases that follow it, did not announce a broad First Amendment

4  right not to be compelled to provide financial support for any

5  organization that conducts expressive activities.  Rather, Abood

6  merely recognized a First Amendment interest in not being

7  compelled to contribute to an organization whose expressive

8  activities conflict with one's freedom of belief."  521 U.S. at

9  471.  The Glickman Court held that the assessments at issue did

10 not violate the First Amendment because "(1) the generic

11 advertising of California peaches and nectarines is

12 unquestionably germane to the purposes of the marketing orders

13 and, (2) in any event, the assessments are not used to fund

14 ideological activities."  Id. at 473.  Thus, as in Abood and

15 Keller, the Court adhered to its germaneness test, holding that

16 speech that is germane to broader, legitimate purposes of

17 association will be upheld.  As Justice Souter noted, the Court

18 was not required to discuss the government speech doctrine

19 because the Secretary of Agriculture expressly waived the

20 argument that the advertisements at issue constituted government

21 speech. Id. at 483 n.2 (Souter, J., dissenting).

22     Only four years later, in United Foods, the Court

23 invalidated a similar federal assessment program imposed on

24 mushroom growers.  The Court distinguished the fruit-tree

25 program upheld in Glickman by explaining that "[i]n Glickman,

26 the mandated assessments for speech were ancillary to a more

comprehensive program restricting marketing autonomy.  Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme."  United Foods, 533 U.S. at 415.[14]

Notably, the Court again did not reach the question of government speech.  Because the issue had not been addressed in the courts below, the Court declined to consider the argument.  The Court suggested, however, that the government would have to establish that it exercised more than pro forma control over the speech for it "to be labeled, and sustained, as government speech."[15]

---

[14]   Based on this distinction, defendants contend that, even if the speech at issue here were not government speech, the use of Tobacco Products Surtax funds for advertising would nevertheless survive constitutional scrutiny because the ads are just one part of a comprehensive regulatory scheme aimed at reducing the harmful effects of tobacco use.  Because the vast majority of the funds raised by the Surtax are used to fund activities other than speech, such as health care, research and other programs, they maintain that this case would be closer to Glickman than United Foods.  Assuming government speech were not involved, defendants' argument has considerable weight, since speech appears not to be "the principal object of the regulatory scheme."  United Foods, 533 U.S. at 415; see Delano Farms Co. v. California Table Grape Comm'n, 318 F.3d 895, 898 (2003) (applying Glickman-United Foods distinction to grape advertising program; explaining that the distinction turns on the comprehensiveness of the regulatory scheme).  Since the speech involved here is government speech, neither Glickman nor United Foods control and there is therefore no need to further address the issue.

[15]   The Court explained:

The Government's failure to raise its argument in the Court of Appeals deprived respondent of the ability to address significant matters that might have been difficult points for the government.  For example, although the Government asserts that the advertising is subject to approval by the Secretary

1    Unlike the mushroom assessment program invalidated in

2  United Foods, there is no question that the DHS officials named

3  as the defendants here exercise much more than pro forma

4  authority over the challenged advertising, and plaintiffs do not

5  suggest otherwise.  The parties do not dispute that the

6  defendants are actually responsible for the speech conveyed.

7  Thus, there are no "difficult issues [that] would have to be

8  addressed [before] the program [is] labeled, and sustained, as

9  government speech." 533 U.S. at 417.

10    In Board of Regents of the Univ. of Wisconsin v.

11  Southworth, 529 U.S. 217 (2000), as in United Foods, the Court

12  made clear that when the question of whether government speech

13  is involved is properly raised, that question presents a

14  threshold issue in a compelled speech challenge under the Abood

15  line of cases.  Only after first concluding that "[t]he case we

16  decide here . . . does not raise the issue of the government's

17  right, or to be more specific, the state-controlled University's

18  right, to use its own funds to advance a particular message,"

19  529 U.S. at 1354, did the Court move on to the compelled speech

20  inquiry, id. ("[t]he Abood and Keller cases, then, provide the

21  ////

22  ////

23  _____

24    of Agriculture, respondent claims that the approval
      is pro forma.  This and other difficult issues would
25    have to be addressed were the program to be labeled,
      and sustained, as government speech.

26    533 U.S. at 417.

1  beginning point of our analysis.").[16]

2      In the wake of United Foods, federal courts addressing

3  challenges of mandatory assessments for generic agricultural

4  advertising programs have uniformly addressed government speech

5  as a threshold issue before turning to the compelled speech

6  inquiry. See, e.g., Pelts & Skins, LLC v. Jenkins, No. Civ.A.02-

7  CV 384, - F.Supp.2d -, 2003 WL 1984368, at *6 (M.D. La. Apr. 24,

8  20903) (challenge of mandatory assessments used to fund generic

9  advertising of alligator products; reasoning that "because the

10 generic advertising here involved is not government speech,

11 plaintiff is free to challenge such advertising on First

12 Amendment grounds"); In re Washington State Apple Comm'n, 257

13 F.Supp.2d 1290, 1305 (challenge of mandatory assessments used to

14 fund generic advertising of apples; reaching compelled speech

15 issue only after holding that "the Commission's activities are

16

---

17      [16] The Ninth Circuit authority on which plaintiffs rely does
    not suggest another mode of analysis.  Plaintiffs rely on Cal-
18  Almond, Inc. v. USDA, 14 F.3d 429 (9th Cir. 1993) ("Cal-Almond I"),
    and go so far as to suggest that the case "controls" the outcome
19  here.  See, e.g., Pl's Reply Br. at 8-10.  But as Cal-Almond's
    procedural history makes clear, and as the Ninth Circuit has
20  explained, that decision's compelled speech analysis is no longer
    good law.  See Cal-Almond v. USDA, 192 F.3d 1272, 1277 (1999) ("Cal
21  Almond IV") ("[I]n light of the Supreme Court's remand in Cal-
    Almond II and our subsequent remand for dismissal in Cal-Almond
22  III, Cal-Almond I has been implicitly overruled.").  The decision's
    holdings on other issues, however, retain precedential value.  See,
23  e.g., NRDC v. Evans, 316 F.3d 904, 906, 911-12 (9th Cir. 2003)
    (relying on Cal-Almond I for an administrative law issue; "The
24  outcome here follows Cal-Almond.").
        Nor does the Ninth Circuit's recent decision in Delano Farms
25  help plaintiffs.  Delano Farms simply offers a straightforward
    application of United Foods to a grape advertising program similar
26  to the mushroom program considered by the Supreme Court.

not protected by the government speech doctrine"); <u>Michigan Pork</u>
<u>Producers v. Campaign for Family Farms</u>, 229 F.Supp.2d 772, 785-
89 (W.D. Mich. 2002) (challenge of mandatory assessments for
generic advertising of pork products; reasoning that "though the
Secretary is integrally involved with the workings of the Pork
Board, this involvement does not translate the advertising and
marketing in question into 'government speech'"); <u>Livestock</u>
<u>Mktg. Ass'n v. United States Dep't of Agric.</u>, 207 F.Supp.2d 992
(D.S.D. 2002) ("The generic advertising program funded by the
beef checkoff is not government speech and is therefore not
excepted from First Amendment challenge"); <u>Charter v. United</u>
<u>States Dep't of Agric.</u>, 230 F.Supp.2d 1121 (D. Mont. 2002)
(rejecting challenge to a program of mandatory assessments for
beef industry advertising on the grounds that the advertising at
issue was government speech and that <u>United Foods</u>, therefore,
did not control).

A recent decision by the Eighth Circuit offers a concise
explanation of the difference between compelled speech and
government speech:

> Unlike [a case] where plaintiffs challenge[] a
> decision concerning the *content of government*
> *speech*, appellees in the present case are
> challenging the government's authority to
> compel them to support speech with which they
> personally disagree; such compulsion is a form
> of *government interference with private speech*.
> The two categories of First Amendment cases –
> government speech cases and compelled speech
> cases – are fundamentally different.

<u>Livestock Mktg. Ass'n v. United States Dep't of Agric.</u>, Nos.

1  02-2769/283, – F.3d –, 2003 WL 21523837 (July 8, 2003) at *8.

2  (emphasis added).  Put simply, while the cases on which

3  plaintiffs rely fall in the compelled speech line, this case

4  involves government speech.  Plaintiffs are not seeking to

5  prevent coerced participation in private expressive association;

6  rather, they are attempting to exercise a taxpayer's veto over

7  speech by the government itself.  As I explain below, that

8  attempt founders on the shoals of the "government speech"

9  doctrine.

10  **B.   WHETHER THE DHS ADVERTISEMENTS ARE GOVERNMENT SPEECH**

11       The determination as to whether speech is properly

12  characterized as government speech or private speech turns

13  entirely on "who is responsible for the speech." <u>Downs v. Los</u>

14  <u>Angeles Unified Sch. Dist.</u>, 228 F.3d 1003, 1011-12 (9th Cir.

15  2000), <u>cert. denied</u>, 532 U.S. 994 (2001).  In other words, the

16  inquiry rests on the level of control and authority that the

17  government exercises over the message conveyed.  <u>See</u> <u>id.</u> at

18  1009-1012 (content of public school bulletin boards was

19  government speech because boards were used to express school

20  policy, access was limited to faculty and staff, and postings

21  were subject to the oversight of school principals); <u>see also</u>

22  <u>Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.</u>, 203

23  F.3d 1085, (8th Cir.), <u>cert. denied</u>, 531 U.S. 814 (2000)

24  (underwriting acknowledgments by state university-run radio

25  station constituted government speech because, <u>inter alia</u>, radio

26  station's staff members composed, edited and reviewed

1  acknowledgment scripts prior to broadcast and because the

2  university was ultimately responsible for all broadcast

3  material).

4      While in some cases the distinction between government

5  speech and compelled allegiance may present "difficult issues,"

6  United Foods, 533 U.S. at 417, the analysis here is

7  straightforward.  The advertisements at issue here are

8  controlled by government officials, who are ultimately

9  responsible for their content.[17]  See Complaint at 2, ¶ 4

10 (alleging that defendant Bonta "is ultimately responsible for

11 the advertising challenged in this action"); id. at 2, ¶ 5

12 (alleging that defendant Bal "is directly responsible for the

13 design, approval and distribution of the advertising challenged

14 in this action.").  Indeed, the Department of Health Services is

15 specifically directed by statute to produce and implement a

16 "media campaign . . . stress[ing] the importance of both

17 preventing the initiation of tobacco use and quitting smoking

18 . . . based on professional market-research and surveys

19 necessary to determine the most effective method of diminishing

20 tobacco use among specific target populations."  Cal. Health &

21 ////

22

23     [17]  In contrast, the "speakers" in the compelled allegiance
    cases cited by the plaintiffs were the Mushroom Council (United
    Foods), the Nectarine Administrative Committee and Peach Commodity
24 Committee (Glickman), the State Bar of California (Keller), the
    Detroit Federation of Teachers (Abood), the California Table Grape
25 Commission (Delano Farms), California Almond Board (Cal-Almond I),
    and the Cattleman's Beef Promotion and Research Board (United
26 States v. Frame, 885 F.3d. 1119 (3rd Cir. 1989)).

1  Saf. Code § 104375(e)(1).[18]

2      If the determination turned on the attribution of the

3  speech rather than control of the message, the result here would

4  be the same.   Unlike the Glickman-United Foods line of cases

5  where a discrete group is compelled to fund the "dissemination

6  of a particular message *identified with that group*," Cal-Almond

7  I, 14 F.3d at 435 (emphasis added), the tobacco advertisements

8  are clearly identified as coming from the California Department

9  of Health Services, i.e. the state government.   Compare Thompson

10 Decl., Exhibit L (challenged advertisements are all clearly

11 identified as "Sponsored by the California Department of Health

12 Services") with Frame, 885 F.2d at 1133 n.11 (beef checkoff

13 advertising contains "no mention of the Secretary or the

14 Department of Agriculture, thus failing to convey that the

15 advertisements are funded through a government program.").[19]

16 ───────────────

17  [18]   The same statute also provides that "[n]o media campaign
   funded pursuant to this article shall feature in any manner the
18 image or voice of any elected public official or candidate for
   elected office, or directly represent the views of any elected
19 public official or candidate for elected office."   Cal. Health &
   Safety Code § 104375(e)(2).   This provision in no way undermines
20 the fact the government is directly responsible for the ads; on the
   contrary, it ensures that the position being advanced is that of
21 the government itself, not of political candidates.   The provision
   is clearly designed to ensure that tax money is not used to fund
22 partisan political speech or electioneering.

23  [19]   With near unanimity, courts that have squarely addressed
   the issue have found that generic agricultural assessment programs,
24 which fund speech by non-governmental or quasi-governmental
   industry groups for the collective benefit of contributing
25 producers, are not governmental speech.   The "Beef Checkoff"
   program appears to be the only such program on which courts have
26 been somewhat divided.   Compare Livestock Marketing, 2003 WL
   21523837 (holding that beef program is not government speech;

                                    32

1   Even if the ads were not so clearly identified, no one could
2   possibly confuse them for the tobacco companies' own speech.
3   This fact of attribution, together with the actual
4   responsibility of government officials for the ads, demonstrates
5   that the speech at issue here is government speech.

6   **C.   THE GOVERNMENT SPEECH DOCTRINE**

7        In discussing the latitude afforded to the government under
8   the "government speech" doctrine, courts have generally spoken
9   in terms that are remarkably open-ended.  Given the purposes of
10  the doctrine, a broad opportunity for government speech is not
11  entirely inappropriate.  I cannot acknowledge the doctrine,
12  however, without also expressing my serious reservations about
13  its undefined and open-ended nature.  I begin by explaining why
14  the government speech doctrine compels the conclusion that the
15  challenged program must be upheld.  I then turn to the potential
16  limits on the doctrine in order to underscore that government
17  speech, like government action, is not without constitutional
18  limits.  Nonetheless, I conclude that none of the present
19  limitations on government speech support plaintiffs' claims.

20       I begin this portion of the analysis by noting that the
21  government does not enjoy protection for its speech under the

22  _____

23  striking down program as "in all material respects, identical to
    the mushroom checkoff program at issue in <u>United Foods</u>"); <u>Goetz v.</u>
24  <u>Glickman</u>, 149 F.3d 1131, 1138-39 (10th Cir. 1998), <u>cert. denied</u>,
    525 U.S. 1102 (1999) (upholding beef program under <u>Glickman</u>);
25  <u>United States v. Frame</u>, 885 F.3d 1119 (3d Cir. 1989) (holding beef
    program is not government speech and passes muster under <u>Central</u>
26  <u>Hudson</u>) <u>with</u> <u>Charter</u> (beef checkoff is government speech and thus
    <u>United Foods</u> does not control).

1  First Amendment.  <u>See</u> <u>Columbia Broad. Sys., Inc. v. Democratic</u>

2  <u>Nat'l Comm.</u>, 412 U.S. 94, 139 (1973) (Stewart, J., concurring)

3  ("The First Amendment protects the press *from* government

4  interference; it confers no analogous protection *on* the

5  government"); <u>id.</u> at 139, n.7 ("'The purpose of the First

6  Amendment is to protect private expression and nothing in the

7  guarantee precludes the government from controlling its own

8  expression or that of its agents.'" (quoting T. Emerson, <u>The</u>

9  <u>System of Freedom of Expression</u> 700 (1970)).

10      Nonetheless, "[t]he government speech doctrine has firm

11  roots in our system of jurisprudence." <u>Livestock Marketing</u>,

12  2003 WL 21523837, at *8.  The Supreme Court has said, in dicta,

13  that "when the government appropriates public funds to promote a

14  particular policy of its own it is entitled to say what it

15  wishes." <u>Rosenberger v. Rector and Visitors of the Univ. of</u>

16  <u>Virginia</u>, 515 U.S. at 813 (1995); see <u>Columbia Broad. Sys.</u>, 412

17  U.S. at 139 & n.7 (Stewart, J., concurring) ("Government is not

18  restrained by the First Amendment from controlling its own

19  expression.").  In equally broad language, the Ninth Circuit has

20  said that when the government is the speaker, "its control of

21  its own speech is not subject to the constraints of

22  constitutional safeguards and forum analysis, but instead is

23  measured by practical considerations applicable to any

24  individuals' choice of how to convey oneself: among other

25  ////

26  ////

34

1   things, content, timing and purpose." <u>Downs</u>, 228 F.3d at 1013.[20]

2        It has been said that the government speech doctrine is a

3   necessary implication of our system of government:

> Government officials are expected as a
> part of the democratic process to
> represent and to espouse the views of a
> majority of their constituents.  With
> countless advocates outside of the
> government seeking to influence its
> policy, it would be ironic if those
> charged with making governmental decisions
> were not free to speak for themselves in
> the process.  If every citizen were to
> have a right to insist that no one paid by
> public funds express a view with which he
> disagreed, debate over issues of great
> concern to the public would be limited to
> those in the private sector, and the
> process of government as we know it
> radically transformed.

13  <u>Keller</u>, 496 U.S. at 12-13.[21]  While plaintiffs' reaction to

---

[20]  Implicit in the government speech cases is a suggestion
that government is just one more participant in the marketplace of
ideas.  Such a notion appears to this court to be naïve.  It
ignores the force of government, as compared to private speech,
and, even more importantly, the access that government speech has
to free media, much less the paid media at issue here.

[21]  Such broad statements appear to this court to miss the
nuances that should inform the question.  It is one thing to
recognize that the government in a democracy must make policy
choices about those issues that are properly before it, and must
be able to inform the public about why those choices were made.
This case appears to present quite a different question. Here, the
legislature has not made a decision about banning or even
regulating the sale of tobacco products to adults, but rather seeks
to persuade adults not to use tobacco products.  In a sense, the
path taken by Proposition 99 turns the democratic process on its
head.  Rather than citizens trying to persuade the government as
to a proper course of its conduct, the government tries to dissuade
the public from engaging in conduct it apparently does not have the
political will to either regulate or ban.  While these observations
may well address questions of political philosophy rather than
purely legal issues, they nonetheless appear appropriate, given
that the entire government speech doctrine derives from political

California's advertisements is quite understandable, the
government speech doctrine teaches that the remedy for their
assertion of harm is "political rather than judicial." <u>Griffin
v. Secretary of Veteran Affairs</u>, 288 F.3d 1309, 1324-25 (Fed.
Cir. 2002). "[W]hen government speaks, for instance to promote
its own policies or to advance a particular idea, it is, in the
end, accountable to the electorate and the political process for
its advocacy.  If the citizenry objects, newly elected officials
later could espouse some different or contrary position."
<u>Southworth</u>, 529 U.S. at 235; <u>see</u> <u>Downs</u>, 228 F.3d at 1011-14 ("In
order for the speaker to have the opportunity to speak as the
government, the speaker must gain favor with the populace and
survive the electoral process.").[22]

Here, some may think that the issue is not as problematic
as government's efforts to persuade the public might be in
another context.  They would take comfort from the fact that the
advertisements in question derive not just from some government
official's choice, but are instead the result of an initiative.
In a sense, then, the program represents the direct decision of
the majority of those voting to attempt to convince smokers to

philosophy rather than a specific constitutional power.

[22]   The assumption that a particular piece of government
speech would suffice in the mind of the voting public to justify
obtaining "newly elected officials" seems not just unrealistic, but
also ignores the difficulty and vast costs of election campaigns
in a state such as California. <u>See</u>, <u>e.g.</u>, <u>California ProLife
Council v. Scully</u>, 989 F.Supp. 1282 (E.D. Cal. 1998).  To say that
the answer to abuse by government speech is political, frequently
will simply mean that there is no answer.

1  forego that vice.  In this court's view, however, those facts
2  provide cold consolation.  The issue is not whether the majority
3  of voters approve of the program, but whether in a system of
4  limited government, such approval should be translated into a
5  government sponsored propaganda effort.  Indeed, as I have
6  previously noted, the fact that a statute was adopted by the
7  initiative process "provides no special insulation from review
8  for asserted constitutional infirmity."  Service Employees Int'l
9  Union v. Fair Political Practices Comm., 747 F.Supp. 580, 583
10 (E.D. Cal. 1990) (citing Citizens Against Rent Control v.
11 Berkeley, 454 U.S. 290, 295 (1981)).  Again, notwithstanding
12 this court's scruples, the present state of the government
13 speech doctrine appears to provide no basis for limiting the
14 advertisements in issue.

15      Certainly, the fact that the advertisements at issue are
16 tax-supported provides no support for plaintiffs' claims.  The
17 government's speech is necessarily paid for by citizens, some of
18 whom – like plaintiffs here – will disagree with its message.
19 See Southworth, 529 U.S. at 229 ("It is inevitable that
20 government will adopt and pursue programs and policies within
21 its constitutional powers but which nevertheless are contrary to
22 the profound beliefs and sincere convictions of some of its
23 citizens.").  The High Court has consistently taught that such
24 disagreement is simply the cost of living in a democracy and
25 provides no basis under the First Amendment to silence the
26 government or to excuse objecting citizens from having to share

1  the costs of its speech.  See Lathrop v. Donahue, 367 U.S. 820,

2  857 (1961) (Harlan, J., concurring) ("A federal taxpayer obtains

3  no refund if he is offended by what is put out by the United

4  States Information Agency."); United States v. Lee, 455 U.S.

5  252, 260 (1982) ("The tax system could not function if

6  denominations were allowed to challenge the tax system because

7  tax payments were spent in a manner that violates their

8  religious belief.").

9      The tobacco companies argue that a crucial difference

10  between this case and others in which the courts have applied

11  the government speech doctrine is that, here, the state is using

12  taxes paid by a specific industry to finance advertising that

13  condemns that very industry.  Again, one may understand the

14  plaintiffs' discomfort, but the Supreme Court has never

15  suggested that the government speech doctrine applies only to

16  speech funded with general tax revenues.  On the contrary, it

17  seems clear that speech by the government is government speech,

18  however funded.  That is, given that the tax is lawfully

19  imposed, the money collected becomes the government's to expend

20  as it sees fit, so long as those expenditures fall within legal

21  limits.  If this were not so, the Supreme Court's discussion of

22  and reference to the government speech doctrine in Abood, 431

23  U.S. at 259 n. 13, Keller, 496 U.S. at 12-13, Glickman, 521 U.S.

24  at 415, and United Foods, 533 U.S. at 417, would have been

25  irrelevant surplusage.  Indeed, the Court has recently declared

26  that "[t]he government, as a general rule, may support valid

1  programs and policies by taxes or *other exactions* binding on

2  protesting parties.   Within this broader principle it seems

3  inevitable that funds raised by the government will be spent for

4  speech and other expression to advocate and defend its own

5  policies."   Southworth, 529 U.S. at 229 (emphasis added);[23] see

6  also United Foods, 533 U.S. at 425-26 (Breyer, J., dissenting)

7  (arguing that if contested assessments on industry constituted

8  "a targeted tax," government could fund advertising with such a

9  tax, which, under Southworth, would be "binding on protesting

10  parties."); cf. Regan v. Taxation With Representation of Wash.,

11  461 U.S. 540, 547 (1983) ("Legislatures have especially broad

12  latitude in creating classifications and distinctions in tax

13  statutes"); Laurence H. Tribe, American Constitutional Law, §

14  12-4 at 807 n. 14 (2d ed. 1988) (observing that while a taxpayer

15  might have standing to challenge "an earmarked tax" used to fund

16  government speech on a political or ideological issue, "it has

17  been assumed that the taxpayer would lose any such challenge on

18  the merits.").

19

20  [23]   In Southworth, which concerned the constitutionality of a
    student activity fee that was used in part to fund student
    organizations engaging in political or ideological speech, the
21  Court noted that because "[t]he University ha[d] disclaimed that
    the speech was its own," the case did not present the question
22  whether the challenge could be sustained "under the principle that
    the government can speak for itself." Id. at 234-35.   The Court
23  went on to observe that, "[i]f the challenged speech here were
    financed by tuition dollars and the University and its officials
24  were responsible for the content, the case might be evaluated on
    the premise that the government itself is the speaker."  Id.  Thus,
25  the Court recognized the applicability of the government speech
    doctrine to speech funded not from general tax revenues, but from
26  tuition dollars.

1    Nor does the content or subject matter of the speech at
2  issue alter the applicability of the government speech doctrine,
3  as it might if the speech were religious, politically partisan,
4  defamatory or in some other way subject to legal constraints.
5  While the precise scope of the government speech doctrine has
6  hardly been considered, there is no doubt that modern government
7  is called upon to deal with "innumerable subjects" on which
8  government may be required to take a position and then explain
9  its reasons for doing so.  <u>National Endowment for the Arts v.</u>
10  <u>Finley</u>, 524 U.S. 569, 598 (1998) (Scalia, J., concurring).
11    As the Supreme Court has recently observed, "tobacco use,
12  particularly among children and adolescents, poses perhaps the
13  single most significant threat to public health in the United
14  States."  <u>Lorillard Tobacco v. Reilly</u>, 533 U.S. 525, 570 (2001)
15  (<u>quoting</u> <u>FDA v. Brown & Williamson</u>, 529 U.S. 120, 161 (2000));
16  <u>cf.</u> <u>id.</u> at 528 ("The governmental interest in preventing
17  underage tobacco use is substantial, and even compelling.");
18  <u>Brown & Williamson</u>, 529 U.S. at 162 (Breyer, J., dissenting)
19  ("Unregulated tobacco use causes more than 400,000 people to die
20  each year from tobacco-related illnesses, such as cancer,
21  respiratory illnesses, and heart disease.  Indeed, tobacco
22  products kill more people in this country every year than . . .
23  AIDS, car accidents, alcohol, homicides, illegal drugs,
24  suicides, and fires, combined." (citations and internal
25  quotation marks omitted)).  It seems clear that the dangers of
26  tobacco use, with its concomitant effects on public health, are

matters properly to be considered by the government and, upon
adopting laws or regulations concerning such use, are proper
subjects for government speech.

I have noted above my discomfort as to the propriety of the
government's speech where the state has not sought to directly
regulate the conduct that its speech condemns.  Candor requires
me to recognize that many others find no such discomfort.
Indeed, government advertising to combat the public health
problems caused by smoking is often cited as a paradigmatic
instance of permissible government speech.  See, e.g., Finley,
524 U.S. at 610-11 (Souter, J., dissenting) (stating that in its
role as speaker, "the government is of course entitled to engage
in viewpoint discrimination: if the Food and Drug Administration
launches an advertising campaign on the subject of smoking, it
may condemn the habit without also having to show a cowboy
taking a puff on the opposite page."); Randall Bezanson and
William Buss, The Many Faces of Government Speech, 86 Iowa L.
Rev. 1377, 1384 (2001) ("The simplest and clearest example of
government advancing a point of view is provided when a 'law'
specifically adopts a program of promoting a specific message.
For example, a law might create a program to assist smokers to
stop smoking.").

Put directly, while I believe that government speech
doctrine raises profound questions concerning the appropriate
role of government in a liberal society, the fact that the
activity being condemned – the sale, purchase and use of tobacco

by adults – is a legal activity does not, under present
doctrine, appear to preclude government from actively
discouraging that activity.  On the contrary, the Ninth Circuit,
by which I am bound, has recently indicated that the government
speech would be unrestricted even if the sale of cigarettes were
not only legal, but constitutionally-protected:

> We agree with the host of other circuits
> that recognize that public officials may
> criticize practices that they would have no
> constitutional ability to regulate, so long
> as there is no actual or threatened
> imposition of government power or sanction.

American Family Ass'n, Inc. v. San Francisco, 277 F.3d
1114, 1125 (9th Cir. 2002).[24]  California's decision to combat

---

[24]  One pair of commentators have asserted that:

Speech is but one means that government must have at its
disposal to conduct its affairs and to accomplish its
ends.  Restricting the use of tobacco, for example,
might be accomplished by regulatory action that makes it
sale or purchase or possession illegal.  It might be
accomplished by taxing the disfavored behavior or
production.  But the restriction might also be
accomplished through the provision of information so
that the consumer's choice will be knowing, or by direct
persuasion in the form of government advertisements or
by educational programs or even by subsidies for groups
or organizations that speak out against tobacco use.
These expressive forms of action are no less necessary
or proper means, nor less practical, efficient, or
effective

Randall Bezanson and William Buss, The Many Faces of Government
Speech, 86 Iowa L. Rev. 1377, 1380 (2001).
    Another commentator has explained that "[t]here are several
ways of understanding government's contribution as speaker . . .
Government speech can serve as an avenue for the representation of
citizens' higher-minded desires even when as consumers they act
with perhaps lower-minded motives (the smoker who supports Surgeon
General's warnings against smoking, the careless litterer who

1  the problem through a strategy of education and counter-
2  advertising, as opposed to outright prohibition, is, under
3  present doctrine, a political and practical judgment that the
4  state is free to make.  See <u>Lorillard Tobacco</u>, 533 U.S. at 587
5  ("The State's assessment of the urgency of the problem posed by
6  tobacco is a policy judgment, and it is not this Court's place
7  to second-guess it."); <u>id.</u> at 571 ("To the extent that federal
8  law and the First Amendment do not prohibit state action, States
9  and localities remain free to combat the problem of underage
10 tobacco use by appropriate means.").  In sum, the challenged
11 program passes constitutional muster.

12 **D.  POTENTIAL LIMITATIONS ON GOVERNMENT SPEECH**

13      Courts, including the Supreme Court and the Ninth Circuit,
14 have framed the government speech doctrine in especially broad
15 terms and have generally done so without discussing ways in
16 which the Constitution, including constitutional provisions
17 other than the First Amendment, may place substantive limits on
18 the government's power to speak.  Nonetheless, "[t]he
19 'government speech' doctrine is still in its formative stages,
20 and, as yet, it is neither extensively nor finely developed."

21 ───────────────────────

22 supports environmental warning campaigns, etc.) . . . Government
   can use its speech powers to alter social norms that might be
   difficult for people to change through private action." Abner S.
23 Greene, *Government Speech on Unsettled Issues*, 69 <u>Fordham L.</u>
   <u>Rev.</u> 1667, 1683-84 (2001).
24      While my own views suggest that a more restricted role for
   government speech is both appropriate and more consistent with the
25 role of government in a democracy, these comments demonstrate that
   others are more sanguine about the exercise of the government's
26 enormous power to persuade.

1  <u>Sons of Confederate Veterans, Inc. v. Commissioner of Virginia</u>
2  <u>Dept. of Motor Vehicles</u>, 305 F.3d 241, 245 (4th Cir. 2002)
3  (Luttig, J., respecting denial of rehearing en banc).  As the
4  contours of the doctrine develop more fully, it is to be hoped
5  that the courts will recognize that limitations, both
6  constitutional and otherwise derived, constrain the government's
7  power to speak on controversial issues.  See <u>Livestock</u>
8  <u>Marketing</u>, 2003 WL 21523837, at *8 ("The government speech
9  doctrine clearly does not provide immunity for all types of
10 First Amendment claims.") (citing <u>Santa Fe Sch. Dist v. Doe</u>, 530
11 U.S. 290 (2000) (prayers at public school football games)).
12 Although these issues have not been raised by the parties and
13 indeed, do not alter resolution of the case at bar, I pause
14 briefly to address some of the important limitations on
15 government speech in order to emphasize that my conclusion
16 regarding plaintiffs' free speech claim does not imply that the
17 "government speech" doctrine offers a blank check for abuse.
18     First, and most obviously, the Establishment Clause
19 prohibits government from using its speech to endorse religion.
20 See <u>Board of Ed. of Westside Community Schools (Dist.66) v.</u>
21 <u>Mergens</u>, 496 U.S. 226, 250 (1990) (O'Connor, J., concurring)
22 ("[T]here is a crucial difference between *government* speech
23 endorsing religion, which the Establishment Clause forbids, and
24 *private* speech endorsing religion, which the Free Speech and
25 Free Exercise Clauses protect.").  As the Court explained in <u>Lee</u>
26 <u>v. Weisman</u>, 505 U.S. 577, 591 (1992), "[t]he First Amendment

44

1 protects speech and religion by quite different mechanisms.

2 Speech is protected by ensuring its full expression even when

3 the government participates, for the very object of some of our

4 most important speech is to persuade the government to adopt an

5 idea as its own.  The method for protecting freedom of worship

6 and freedom of conscience in religious matters is quite the

7 reverse.  In religious debate or expression the government is

8 not a prime participant, for the Framers deemed religious

9 establishment antithetical to the freedom of all." (citations

10 omitted).[25]

11    Second, the First Amendment may place other substantive

12 limits on the government's use of speech.  For instance,

13 government speech that "drowns out" private speech may violate

14 the First Amendment.  See National Ass'n for Advancement of

15 Colored People v. Hunt, 891 F.2d 1555, 156 (11th Cir. 1990)

16 ("[T]he government may not monopolize the 'marketplace of

17 ideas,' thus drowning out private sources of speech . . . For

18 example, the government may not confer radio frequency

19

20    [25] Plaintiffs open their brief by invoking Thomas Jefferson's
pronouncement that "to compel a man to furnish contributions of
21 money for the propagation of opinions which he disbelieves, is
sinful and tyrannical."  P. Kurland & R. Lerner, eds, The Founders'
22 Constitution, vol. 5 (1987) at 77.  The quoted statement is taken
from Jefferson's Virginia Bill for Establishing Religious Freedom,
23 a landmark anti-establishment measure declaring that "no man shall
be compelled to frequent or support any religious worship, place,
24 or ministry whatsoever."  Id.  It is perhaps significant that the
statement arose in this context, since "the Establishment Clause
25 is a specific prohibition on forms of state intervention in
religious affairs with no precise counterpart in the speech
26 provisions." Lee v. Weisman, 505 U.S. 577, 591 (1992).

1  monopolies on broadcasters it prefers."); <u>Warner Cable</u>

2  <u>Communications v. City of Niceville</u>, 911 F.2d 634, 638 (11th

3  Cir. 1990) ("[T]he government may not speak so loudly as to make

4  it impossible for other speakers to be heard by their audience.

5  The government would then be preventing the speakers' access to

6  that audience, and first amendment concerns would arise.").[26]

7  For this reason, it is particularly important for courts to

8  carefully distinguish between situations in which the government

9  speaks for itself and situations in which the government creates

10 a public forum for private speech.  As Judge Luttig recently

11 observed, it may even be that these categories will not always

12 be mutually exclusive.  <u>See</u> <u>Sons of Confederate Veterans</u>, 305

13 F.3d at 245 (Luttig, J., respecting denial of rehearing en

14 banc).

15     Third, the Constitution would appear to contain a core

16 structural principle, perhaps embodied in the Republican Form of

17 Government Clause, that would limit the use of tax dollars to

18 fund overtly partisan activity.[27]  <u>See</u> <u>NEA v. Finley</u>, 524 U.S.

19 _____

20    [26]  Here, of course, the "drown out" concern appears
   inapplicable.  The tobacco industry spends much more than
   California does on advertising within the state itself, even
21 excluding national advertising expenditures that have an impact in
   California.  In 1999/2000, the tobacco industry spent an estimated
22 $823 Million advertising and promoting tobacco use in California,
   an amount that translates into $34.01 for every man, woman and
23 child in the state.  In contrast, the state's tobacco control
   budget for 1999/2000 was $3.42 per capita.  <u>See</u> DHS, <u>California</u>
24 <u>Tobacco Control Update</u> (Nov. 2002).

25    [27]  Article IV, § 4 of the Constitution, which provides that
   "[t]he United States shall guarantee to every State in this Union
26 a Republican Form of Government," is generally treated as

569, 598 (1998) (Scalia, J., concurring) ("[I]t would be
unconstitutional for the government to give money to an
organization devoted to the promotion of candidates nominated by
the Republican Party — but it would be just as unconstitutional
for the government itself to promote candidates nominated by the
Republican Party, and I do not think that that
unconstitutionality has anything to do with the First
Amendment."); Lathrop v. Donahue, 367 U.S. 820, 853 (1961)
(Harlan, J., concurring in the judgment) (stating that a
legislature could not constitutionally "'create a fund to be
used in helping certain political parties or groups favored' by
it 'to elect their candidates or promote their controversial
causes'" (quoting International Ass'n of Machinists v. Street,
367 U.S. 740, 788 (1961) (Black, J., dissenting)).  One recent
commentator has argued for an even broader "political anti-
establishment" principle, which would prohibit a range of speech
activity by the government in the sphere of election activities

judicially unenforceable, based on a series of decisions thought
to have established a per se rule of nonjusticiability.  See
Colegrove v. Green, 328 U.S. 549, 556 (1946) ("Violation of the
great guaranty of a republican form of government in States cannot
be challenged in the courts.").  In recent years, however, a
growing chorus of academic critics has urged the Court to abandon
the per se nonjusticiability rule in Guarantee Clause cases.  See
Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be
Justiciable*, 65 U. Colo. L. Rev. 849, 850 n.4 (1994).  Recently,
the Court has shown some signs of receptiveness to these arguments,
and "has suggested that perhaps not all claims under the Guarantee
Clause present nonjusticiable political questions." New York v.
United States, 505 U.S. 144, 185 (1992) (O'Connor, J.) (declining
to decide the issue); see Reynolds v. Sims, 377 U.S. 533, 582
(1964) ("*[s]ome questions* raised under the Guarantee Clause are
nonjusticiable").

1  in a manner analogous to the Establishment Clause.   See

2  generally *Brian P. Marron, Doubting America's Sacred Duopoly:*

3  *Disestablishment Theory and the Two-Party System*, 6 Tex. F. on

4  C.L. & C.R. 303 (2002).[28]   Such a principle might be thought to

5  flow from Justice Jackson's eloquent statement, which remains

6  perhaps the best encapsulation of the First Amendment's core

7  values: "If there is any fixed star in our constitutional

8  constellation, it is that no official, high or petty, can

9  prescribe what shall be orthodox in politics, nationalism,

10  religion, or other matters of opinion or force citizens to

11  confess by word or act their faith therein." West Virginia Bd.

12  of Educ. v. Barnette, 319 U.S. 624, 642 (1943).   But see

13  American Family Ass'n v. City and County of San Francisco, 277

14  F.3d 1114, 1124 (9th Cir. 2002) (holding that for the orthodoxy-

15  of-belief prohibition to apply, there must be more than mere

16  speech by the government; rather, there must be "actual or

17  threatened imposition of government power or sanction.").

18  Whatever its source, it seems clear that the Constitution places

19  some structural limits, as yet undefined, on the ability of

20  government officials to divert public funds for partisan speech.

21  ───────────────

22      [28]   This article is a recent revival of an argument advanced
in the earlier work of two scholars, both of whom argued for broad
limitations on government speech.  See Mark G. Yudof, *When*

23  *Government Speaks* (1983);  Robert D. Kamenshine, *The First
Amendment's Implied Political Establishment Clause*, 67 Cal. L. Rev.

24  1104 (1979).  These broad arguments have gained few adherents among
commentators, however, and even its chief proponents appear to have

25  recognized that the theory is out of step with current
jurisprudence.  See Robert D. Kamenshine, *Reflections on Coerced*

26  *Expression*, 34 Land & Water L. Rev. 101 (1999).

1        Fourth, it is possible that the Due Process Clause and the

2   Equal Protection Clause may provide substantive limitations on

3   government speech programs where the legislative classifications

4   do not bear a rational relationship to a legitimate state

5   interest.  See Richardson v. City & County of Honolulu, 124 F.3d

6   1150, 1162 (9th Cir. 2000).[29]  Imagine a situation in which a

7   state legislature, under the influence of a powerful dairy

8   industry, decides to tax the margarine industry and use the

9   money for baseless ads attacking the industry.  Such a scheme,

10  it seems, would not hold up to constitutional scrutiny.

11  "[P]rotecting a discrete interest group from economic

12  competition is not a legitimate governmental purpose."  See

13  Craigmiles v. Giles, 312 F.3d 220 (6th Cir. 2003) (rejecting

14  proffered health and safety justifications and holding that a

15  state's prohibition on the sale of caskets by anyone not

16  licensed as a funeral director violated due process and equal

17

18       [29]  Some have also suggested that government speech with
    discriminatory content would be barred by equal protection or anti-
19  endorsement principles.  See, e.g., James Forman, Note, Driving
    Dixie Down: Removing the Confederate Flag from the Southern State
20  Capitols, 101 Yale. L.J. 505 (1991) (arguing that the Southern
    states' flying of the Confederate Flag "constitutes government
21  endorsement of discrimination by private parties" and is therefore
    unconstitutional); cf. American Family Ass'n, 277 F.3d at 1127
22  (Noonan, J., dissenting) ("Suppose a city council today, in the
    year 2002, adopted a resolution condemning Islam because its
23  teachings embraced the concept of a holy war and so, the resolution
    said, were 'directly correlated' with the bombing of the World
24  Trade Center.  Plausibly the purpose might be to discourage terror
    bombings.  Would any reasonable, informed observer doubt that the
25  primary effect of such an action by a city could be the expression
    of official hostility to the religion practiced by a billion
26  people?").

protection clauses); see City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978) (holding, in dormant commerce clause context, that "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.").

Finally, the Constitution places substantial limits on the government's ability to use its speech to interfere with or punish constitutionally-protected activity.  As a general rule, of course, the Supreme Court's "unconstitutional conditions" jurisprudence has said that the state may exercise its power to spend in order to discourage protected activity.  See, e.g., Maher v. Roe, 432 U.S. 464 (1977) (holding that the government "may make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.").  Perhaps the most extreme (and extremely controversial) application of this principle was Rust v. Sullivan, 500 U.S. 173, 192-93 (1991), which sustained a prohibition on abortion-related advice by recipients of federal funds designated for family-planning counseling.[30]  But even

---

[30]   While "Rust did not place explicit reliance on the [government speech rationale], when interpreting the holding in later cases [the Court has] explained Rust on this understanding." Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 540 (2001).  This explanation of Rust's holding, however, may be dicta.  See Brown v. California Dep't of Transp., 321 U.S. 1217, 1225 (9th Cir. 2003) ("Rust addresses only the government's ability to exclude from a government-funded program speech is incompatible with the program's objectives."); Velazquez, 531 U.S. at 554 (Scalia, J., dissenting) (stating that if the speech "at issue in Rust constituted 'government speech,' it is hard to imagine what subsidized speech would not be government speech").

there, the Court was careful to emphasize the difference between discouragement and coercion:

> A refusal to fund protected activity, without more, cannot be equated with the imposition of a '*penalty*' on that activity. There is a basic difference between *direct state interference* with a protected activity and state encouragement of alternative activity consonant with legislative policy.

500 U.S. at 193 (quoting Harris v. McRae, 448 U.S. 297, 317 n.19 (1980)); Maher, 432 U.S. at 475) (internal quotation marks and citations omitted); see also American Family Ass'n, 277 F.3d at 1125 (holding that government may criticize protected activity "so long as there is no actual or threatened imposition of government power or sanction").

It is easy to imagine, however, a government speech program that goes beyond mere discouragement and crosses into constitutionally-forbidden territory. Suppose, for instance, that a state decided to levy a severely punitive per-procedure tax on doctors who perform abortions and directed that the revenue thereby derived be used to fund an aggressive public advertising campaign designed to intimidate women seeking abortions and vilify the doctors who provide them. The government speech doctrine notwithstanding, such a program would undoubtedly constitute an impermissible "penalty" on, or an instance of "direct state interference" with, protected activity. As even the Rust Court implicitly acknowledged, such a program would fail constitutional scrutiny.

1    Plaintiffs make no claim that the advertisements at issue

2 fall within any of the above limitations or the government

3 speech doctrine, and it does not require extended discussion to

4 recognize that their reticence is entirely proper.  While it is

5 likely that as the government speech doctrine develops, other

6 limitations will be recognized, plaintiffs do not suggest any

7 such development.  Nonetheless, it is appropriate to reiterate

8 that government is no more free to disregard constitutional and

9 other legal norms when it speaks than when it acts.

10                                   V.

11              **ARTICLE I OF THE CALIFORNIA CONSTITUTION**

12    In addition to their First Amendment claim, plaintiffs'

13 bring an identical claim under the California Constitution's

14 free speech clause.  <u>See</u> Cal. Const., Art. I, § 2.  In <u>Pennhurst</u>

15 <u>State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 117 (1984),

16 however, the Supreme Court held that "a federal suit against

17 state officials on the basis of state law contravenes the

18 Eleventh Amendment when . . . the relief sought and ordered has

19 an impact directly on the State itself."  As plaintiffs now

20 concede, this is such a suit.  Because the Eleventh Amendment

21 operates as a restriction on the jurisdiction of the federal

22 courts, <u>see California v. Deep Sea Research, Inc.</u>, 523 U.S. 491

23 (1998), plaintiffs' claim under the California Constitution must

24 be dismissed without prejudice to it being re-filed in a court

25 of competent jurisdiction.  <u>See Freeman v. Oakland Unified Sch.</u>

26 <u>Dist.</u>, 179 F.3d 846, 847 (1999) (reversing district court's

1   dismissal with prejudice of state law claim barred by

2   Pennhurst); Frigard v. United States, 862 F.2d 201, 204 (9th

3   Cir.1988) (holding dismissals for lack of jurisdiction "should

4   be . . . without prejudice so that a plaintiff may reassert his

5   claims in a competent court").

6                                   **VI.**

7                         **SEVENTH AMENDMENT**

8       The Seventh Amendment provides in relevant part: "In suits

9   at common law, where the value in controversy shall exceed

10  twenty dollars, the right of a trial by jury shall be

11  preserved."  U.S. Const., amend. VII.  Plaintiffs' attempt to

12  invoke this provision must fail.  It is established that the

13  right to a jury trial in civil cases under the Seventh Amendment

14  is not among those provisions of the Bill of Rights that have

15  been made applicable to the states through the Fourteenth

16  Amendment.  See Gasperini v. Center for Humanities, Inc., 518

17  U.S. 415, 418 (1996) ("Seventh Amendment . . . governs

18  proceedings in federal court, but not in state court"); Curtis

19  v. Loether, 415 U.S. 189, 192 n.6 (1974) (the Supreme Court "has

20  not held that the right to jury trial in civil cases is an

21  element of due process applicable to state courts through the

22  Fourteenth Amendment"); Walker v. Sauvinet, 92 U.S. 90, 92

23  (1875) ("The States, so far as [the Fourteenth] amendment is

24  concerned, are left to regulate trials in their own courts in

25  their own way.  A trial by jury . . . is not, therefore, a

26  privilege or immunity of national citizenship, which the States

                                    53

1  are forbidden by the Fourteenth Amendment to abridge.").
2  Because defendants are state officials, and because the Seventh
3  Amendment does not restrain the conduct of state officials,
4  plaintiffs cannot maintain a Seventh Amendment claim against
5  them.

6                                    **VII.**

7          **THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT**

8          Finally, plaintiffs argue that the State's broadcast of its
9  ads denies them due process of law.  To establish a procedural
10 due process claim, plaintiffs must first show the deprivation of
11 a liberty or property interest protected by the Due Process
12 Clause.  <u>See Bd. of Regents of State Colleges v. Roth</u>, 408 U.S.
13 564 (1972).  "Plaintiffs all are corporations.  Corporations do
14 not have fundamental rights; they do not have liberty interests,
15 period."  <u>Nat'l Paint & Coatings Ass'n v. City of Chicago</u>, 45
16 F.3d 1124, 1129 (7th Cir. 1995).  Corporations do have property
17 interests, however, that may be protected by procedural due
18 process.

19         Here, plaintiffs allege that the challenged ads stigmatize
20 them and publicly disparage their reputation and character.  <u>See</u>
21 Complaint at 11, ¶ 40.  Allegations of injury to reputation
22 alone, however, cannot support a claim for violation of due
23 process, and therefore must be accompanied by a constitutionally
24 recognized injury.  <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 712 (1976).
25 This rule, labeled the "stigma-plus" standard, requires a
26 plaintiff to show that the government official's conduct

1  deprived the plaintiff of a previously recognized property or
2  liberty interest in addition to damaging the plaintiff's
3  reputation.  Id. at 712.  The rule is designed to prevent the
4  Due Process Clause from becoming an all-purpose
5  constitutionalization of state tort law.  Id. at 701.  The
6  Supreme Court has explained that an "interest in reputation is
7  simply one of a number which the State may protect against
8  injury by virtue of its tort law, providing a forum for
9  vindication of those interests by means of damages actions.  And
10 any harm or injury to that interest, even where as here
11 inflicted by an officer of the State, does not result in a
12 deprivation of any 'liberty' or 'property' recognized by state
13 or federal law[.]".  Id. at 712; cf. Siegert v. Gilley, 500 U.S.
14 226, 234 (1991) ("Most defamation plaintiffs attempt to show
15 some sort of special damage and out-of-pocket loss which flows
16 from the injury to their reputation.  But so long as such damage
17 flows from injury caused by the defendant to a plaintiff's
18 reputation, it may be recoverable under state tort law but it is
19 not recoverable in a Bivens action.").  The Ninth Circuit has
20 made clear that this rule is no less applicable to businesses,
21 holding that the dissemination of a defamatory government report
22 did not deprive a California business of "property" in its
23 customer goodwill.  See WMX Technologies, Inc. v. Miller, 197
24 F.3d 367, 376 (9th Cir. 1999)(en banc).

25     Plaintiffs' attempts to satisfy the "plus" element of the
26 "stigma-plus" requirement essentially by re-alleging that they

1 have been deprived of their Seventh Amendment right to a fair

2 trial.  See Pls.' Reply Br. at 17-18.  In proceeding this way,

3 plaintiffs' third cause of action (due process) depends

4 necessarily on the resolution of their fourth cause of action

5 (the Seventh Amendment).  Hence, because the Seventh Amendment

6 claim fails as a matter of law, the due process claim likewise

7 fails.

8      Although plaintiffs fail to state a claim for denial of

9 procedural due process, if the plaintiffs truly believe that the

10 challenged advertisements are both provably false and

11 disparaging to their business reputations, they are free to seek

12 relief against the State of California or its officials in a

13 defamation action under state law.[31]

14                              **VIII.**

15                           **CONCLUSION**

16      Plaintiffs state no claims upon which relief can be

17 granted.  Accordingly, the Court hereby ORDERS as follows:

18      1.        Defendants' motion to dismiss is GRANTED.

19      2.        Plaintiffs' motion for a preliminary injunction

20                is DENIED as moot.

21

22

---

23      [31]  Plaintiffs' Due Process claim has other problems.  To be
cognizable, the claim must allege the government's stigmatizing
24 speech is "substantially false."  Campanelli v. Bockrath, 100 F.3d
1476, 1484 (9th Cir. 1996)(citing Codd v. Velger, 429 U.S. 624, 628
25 (1977)(per curiam)).  Plaintiffs' allegations appear insufficient
in that regard.  I do not rely on that ground, since it is
26 susceptible to cure by amended pleading.

                                56

3.      As to plaintiffs' claim under Article I of the California Constitution, the Clerk is directed to enter judgment against the plaintiffs without prejudice.

4.      As to plaintiffs' claims under the First Amendment, the Seventh Amendment and the Due Process Clause of the Fourteenth Amendment, the Clerk is directed to enter judgment against the defendants with prejudice.

5.      The Clerk is directed to CLOSE the case.

IT IS SO ORDERED.

DATED:  July 21, 2003.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
July 22, 2003

* * CERTIFICATE OF SERVICE * *

2:03-cv-00659

R.J. Reynolds

    v.

Bonta

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 22, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Todd E Thompson              AR/LKK (2)
        Howard Rice Nemerovski Canady Falk and Rabkin
        Three Embarcadero Center
        Suite 700
        San Francisco, CA  94111

        Karen Leaf
        Attorney General's Office for the State of California
        PO Box 944255
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Shannon L Spangler
        Shook Hardy and Bacon LLP
        333 Bush Street
        Suite 600
        San Francisco, CA  94104-2828

                                    Jack L. Wagner, Clerk

                                BY: _____